GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York
By:    JACOB H. GUTWILLIG
        Assistant United States Attorney
        One Saint Andrew's Plaza
        New York, New York 10007
        Tel. (212) 637-2215

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                    :
UNITED STATES OF AMERICA,
                                                    :
                    Plaintiff,
                                                    :       VERIFIED CIVIL
            -v.-                                     :       COMPLAINT
                                                    :       FOR FORFEITURE
$457,749.55 IN UNITED STATES CURRENCY   :       20 Civ. ___ (___)
FORMERLY ON DEPOSIT AT TD BANK IN
ACCOUNT NUMBER 4332955347 HELD IN       :
THE NAME OF LANDMASS REAL ESTATE        :
DEVELOPER,
                                                    :
                    Defendant in Rem.
                                                    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

        Plaintiff United States of America, by its attorney Geoffrey S. Berman, United

States Attorney for the Southern District of New York, for its verified complaint, alleges, upon

information and belief, as follows:

## I.  NATURE OF THE ACTION

        1.      This action is brought by the United States of America seeking the

forfeiture of all right, title and interest in $457,749.55 in United States Currency formerly on

deposit at TD Bank in account number 4332955347 held in the name of Landmass Real Estate

Developer (the "Defendant in Rem" or the "Defendant in Rem Funds"), currently held in the

custody of United States Customs and Borders Protection.  On or about December 16, 2016 the

Honorable James C. Francis IV sitting in the United States District Court, Southern District of New York, signed a seizure warrant authorizing federal law enforcement agents to seize the Defendant in Rem Funds as being subject to forfeiture to the United States of America.

2.     The Defendant in Rem Funds are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) because there is probable cause to believe the Defendant in Rem Funds constitute property involved in 1) concealment money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i) and 2) operation of an unlicensed money transmitting business, in violation 18 U.S.C. § 1960.   The Defendant in Rem Funds are also subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) because there is probable cause to believe the Defendant in Rem Funds are property constituting or derived from proceeds traceable to wire fraud, in violation of 18 U.S.C. § 1343.

## II.   JURISDICTION AND VENUE

3.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1345 and 1355.

4.     Venue is proper pursuant to 28 U.S.C. § 1355(b)(1)(A) because acts and omissions giving rise to the forfeiture occurred in the Southern District of New York.

5.     The Defendant in Rem Funds are presently in a United States Department of Treasury Suspense Account.

## III.   PROBABLE CAUSE FOR FORFEITURE

6.     On or about October 4, 2018, husband and wife Abisoye Ariyo and Monica Ariyo were charged, in the Southern District of New York, in a two-count Indictment, 18 Cr. 725 (ALC) (the "Indictment"), with conspiracy to operate an unlicensed money transmitting business, in violation of 18 U.S.C. § 371, and operation of an unlicensed money transmitting

business, in violation of 18 U.S.C. § 1960.   A copy of the Indictment is attached hereto as Exhibit A and is fully incorporated by reference herein.

7.     On or about September 19, 2019, Monica Ariyo entered into a Deferred Prosecution Agreement with the Government in relation to the counts charged against her in the Indictment.

8.     On or about October 24, 2019, Abisoye Ariyo entered into a Deferred Prosecution Agreement with the Government in relation to the counts charged against him in the Indictment.[1]

**A.  Landmass and its Owners Were Not Engaged in Legitimate Business**

9.     For the reasons set forth below, there is probable cause to believe that the Defendant in Rem Funds constitute property involved in concealment money laundering and the operation of an unlicensed money transmitting business.   Additionally, there is probable cause to believe that the Defendant in Rem Funds are property constituting or derived from proceeds traceable to wire fraud.

10.     The Defendant in Rem Funds were formerly held at TD Bank in account number 4332955347 (the "TD Bank Account") in the name of Landmass Real Estate Developer ("Landmass"), a trade-name registered in New Jersey on or about August 5, 2016, for a sole proprietorship owned by Abisoye Ariyo and Monica Ariyo.

11.     On the same day "Landmass" was registered, the Ariyos opened the TD Bank Account in the name of Landmass. According to the account opening documents (the "New Business Account Documents"), the TD Bank Account is a business operating account for

---

[1] Pursuant to the terms of their Deferred Prosecution Agreements, each of Monica Ariyo and Abisoye Ariyo consented to the forfeiture of the Defendant in Rem Funds and agreed not to file a claim in any civil forfeiture proceeding involving the Defendant in Rem Funds.

Landmass, a "real estate business," whose principal line of business is described as "land subdivision" with annual estimated sales of $0.00 to $500,000.00, with an address listed in Freehold, New Jersey (the "Freehold Property").

12.     In actuality, however, as the following facts demonstrate, which were uncovered pursuant to an investigation of the Ariyos, Landmass, and the TD Bank Account (the "HSI Ariyos Investigation") conducted by the United States Department of Homeland Security, Homeland Security Investigations ("HSI"), Landmass was not in the real estate business:

a.     The Freehold Property, Landmass's purported business location, was a residential house in a suburban neighborhood. The Ariyos appeared to reside at the Freehold Property.

b.     There were no outward indicators that the Freehold Property was used to conduct real estate business; for example, it did not display commercial signage, nor was there any evidence of customer foot traffic to the Freehold Property.

c.     Landmass did not appear to own any real estate and, other than the Freehold Property, the Ariyos did not appear to own any other real estate.

d.     Landmass had virtually no online presence.

e.     Searches conducted by HSI investigators of law enforcement databases using the Tax Identification Number (which is also Abisoye Ariyo's Social Security Number) provided for Landmass to TD Bank did not uncover any activity relating to Landmass or any activity relating to the real estate business.

       f.      The TD Bank Account was opened on or about the same day that Landmass was registered as a trade name.

13.      As the preceding facts demonstrate, Landmass was not used by the Ariyos or anyone else, to conduct real estate business, the business Landmass was purportedly in.

14.      Moreover, as the following facts demonstrate, which were uncovered pursuant to the HSI Ariyos Investigation, the Ariyos, both born in Nigeria, did not appear to be legitimately employed:

       a.      Although Abisoye Ariyo was a registered physical therapist and Monica Ariyo a registered nurse, both registered in New Jersey, searches conducted by HSI of a New Jersey employment database failed to identify any employment or source of income for either of the Ariyos from January 1, 2013 until the close of the third quarter of 2016, with the single exception of a $170.38 payment to Monica Ariyos in the first quarter of 2013.

       b.      Surveillance conducted by HSI of the Ariyos did not reveal them to be engaged in the real estate business or employed in any legitimate capacity.

       c.      An HSI open source investigation of the Ariyos did not reveal any indication that either was legitimately employed.

**B.  The TD Bank Account Held in the Name of Landmass**

15.     As stated, on or about August 5, 2016, the same day "Landmass" was registered, the TD Bank Account in the name of Landmass was opened in Freehold New Jersey without any funds on deposit at opening.

16.     From account opening until on or about November 3, 2016, after a freeze the prior day on withdrawals (but not deposits) was placed by TD Bank on the TD Bank Account, deposits into the account totaled approximately $546,805.20 (the "TD Bank Account Deposits"), an amount which, in this approximately three month period, exceeded total annual estimated sales for Landmass (*supra* ¶ 9).   On or about November 3, 2016, the account balance was approximately $457,874.55.   On or about December 16, 2016, the TD Bank Account balance remained at approximately $457,874.55.

17.     Based on the training and experience of the HSI investigators conducting the HSI Ariyos Investigation, the TD Bank Account Deposits lacked a legitimate real estate business purpose, or any other legitimate business purpose.   HSI investigators observed certain red flags, particularly when taken together, which indicated to them that the TD Bank Account was being used as a vehicle for criminal activity, such as the operation of an unlicensed money transmitting business.   These red flags included:

> a.     That the deposits into the TD Bank Account consisted of numerous deposits in multiple formats made by at least twenty different individuals and/or entities, including but not limited to approximately:
>
> i.   ten wire transfers totaling approximately $196,836.25;
>
> ii.   thirty-seven check deposits totaling approximately

$141,294.00;

   iii.  forty cash deposits totaling approximately $89,461.00;

   iv.  nine cashier's check deposits totaling approximately $91.459.95; and

   v.  five ACH deposits totaling approximately $9,780.00.

b.     The TD Bank Account Deposits were made at numerous bank branches in at least three different states including from at least three separate bank branch locations in the Bronx, New York.

c.     It appears that cash was deposited into the TD Bank Account from at least fifteen different bank branches in New Jersey, four different bank branches in New York, and one bank branch in Washington D.C.

d.     The TD Bank Account Deposits involving cash occurred at a high level of frequency—usually two or more in a single week and sometimes two or more in a single day, usually occurring at two or more different bank branches—for example:

   i.  On or about the week beginning August 15, 2016, three cash deposits were apparently made into the TD Bank Account in three different amounts— $1,000.00 deposited on August 15, 2016 at a branch in Willingboro, New Jersey and $9,000.00 deposited on August 18, 2016, and $6,000.00 deposited on August 19, 2016, both at a branch in the Bronx, New York.

      ii.  On or about August 31, 2016, two cash deposits were apparently made into the TD Bank Account at two different bank branches: a $5,000.00 deposit in East Brunswick, New Jersey, and a $1,000.000 deposit in Ewing, New Jersey;

      iii.  On or about October 31, 2016, five cash deposits were apparently made into the TD Bank Account in five different amounts--$200.00, $1,000.00, $1200.00, $1900.00, and $2500.00—at five different bank branch locations.

e.      The deposits into the TD Bank Account were made over a relatively short period of time: in excess of approximately $546,805.20 in deposits were made in a period of less than three months between on or about August 5, 2016 and on or about November 3, 2016, where, as stated, Landmass's sales for an entire year were estimated by the Ariyos at a maximum of $500,000.

f.      All of the deposits into the TD Bank Account were in rounded, whole dollar amounts, nearly all for whole hundreds or whole thousands of dollars (where, in the experience of HSI investigators conducting the HSI Ariyos Investigation, deposits into an account used by a business would typically be for non-rounded amounts).

8

g.     Memo lines in regard to deposits into the TD Bank Account made by check, and wire transfer detail lines in regard to deposits into the TD Bank Account made by wire, were almost entirely absent of any information associating these deposits with real estate business.

h.     Twenty-one checks written by a co-conspirator in the name of an entity supposedly engaged in the travel business did not appear to have a legitimate business purpose related to travel or real estate as they were for large sums of money deposited through twenty-one checks over a short period of time (less than three months) into the TD Bank Account which was supposedly operated to conduct real estate business.

18.     Expenditures from the TD Bank Account did not include expenditures consistent with that of regular business activity such as regular business expenses, overhead, or payroll but instead included payments made from the TD Bank Account for personal check card purchases and personal payments made over the internet including three check card purchases made at Royal Caribbean Cruises, payments to Seton Hall University, Jaguar Land Rover, Rutgers University and payments for apparently personal expenses such as books, gas, groceries and payment to the Ariyos and members of their family.

**C.  The TD Bank Account Was Used by the Ariyos to Operate an Unlicensed Money Transmitting Business.**

19.     On or about January 2, 2017, pursuant to a routine border search conducted by United States Customs and Border Protection at a port in New Jersey of the Ariyos, who were returning from a cruise from an international destination, and also pursuant to

a search warrant signed on January 10, 2017 by the Honorable Kevin N. Fox sitting in the United States District Court, Southern District of New York, evidence was recovered from four cellphones ("Cellphone-1," "Cellphone-2," "Cellphone-3," and "Cellphone-4") seized from the Ariyos.   This evidence revealed—as discussed in greater detail below—that the Ariyos were using the TD Bank Account to operate an unlicensed international money transmitting business, which also utilized bank accounts in Nigeria, among other accounts.

20.     Cellphone-1 contained, *inter alia*, the following text messages:

   a.     On or about November 7, 2016 a text message sent to Cellphone-1 from a co-conspirator ("CC-1") stated "I need one million," to which, on or about the same day, the following text message responses were sent from Cellphone-1: "D problem is that how do I collect dollar from u?," "will do it for 440," and "I need detail of d acct to be credited in Nigeria."

   b.     On or about November 8, 2016 the following text messages were sent from Cellphone-1 to CC-1: "Paid 1 million naira to ur acct yesterday," "wire to Ocean first bank, account [ending in]3737, routine #, [ending in]353, acct name: Abisoye Ariyo," "$3297," and "don't wire this money yet, still keep it."

21. Cellphone-2 contained, *inter alia*, the following text messages:

   a.     On or about October 28, 2016 a text message was sent to Cellphone-2 by a co-conspirator ("CC-2") stating "Are you still doing money transfer .. What's your rate today pls," to which, on or about the same day and on or about the following day,

10

the following text message responses were sent from Cellphone-2: "GM. The rate is 435" and "Pls make deposits to: TD Bank Acct name: Landmass Real Estate Developer Acct number: 4332955347 [the TD Bank Account Number which contained the Defendant In Rem Funds] routine number: 031201360."

b.      On or about October 30, 2016 a text message sent from Cellphone-2 to CC-2 "Pls, provide me with the beneficiary acct in Nigeria. I will not be able to pay tomorrow if l don't receive the acct info tonight."

c.      On or about August 19, 2016 a text message sent from a co-conspirator ("CC-3") to Cellphone-2 stated "Hi got your phone number from friends. What is rate today How can we do through you," to which, on or about the same day, the following text message responses were sent from Cellphone-2: "It's 385 Naira" and "Can you pls identify yourself?"

d.      On or about August 19, 2016 text messages were sent from Cellphone-2 to CC-3 stating "My name is Mrs. Ariyo" and "Pls make deposits to: TD Bank Acct name: Landmass real estate developer Acct number: 4332955347 [the TD Bank Account which held the Defendant in Rem Funds]."

22. Cellphone-3 contained, *inter alia*, the following text messages:

a.      On or about June 22, 2016 a text message sent to Cellphone-3

from a co-conspirator ("CC-4") stated "Can you give me 330?" to which, on or about the same day, the following text message response was sent from Cellphone-3: "It is 330 in Nigeria, I normally do it at 10 short of what is going on in Nigeria, which would have been 320. I decided to reduce it by 5 from today, that is how I arrived 325. Ur d first person I will give that deal."

b.      On or about October 3, 2016, a text message sent to Cellphone-3 by CC-4 stated "Hi Louis I need one million naira in Lagos Can you sell at 475?" to which, on or about the same day, the following text message response was sent from Cellphone-3: "I can talk about d rate tomorrow, I don't know d going rate now. Will let u know tomorrow."

c.      On or about October 19, 2016 a text message sent from Cellphone-3 to CC-4 stated "I leave d different of about 20 just to protect myself from d fluctuations. NP, I can do for u for 435, I don't think that 5 naira can affect any of us."

23. Cellphone-4 contained, *inter alia*, the following text messages:

a.      On or about October 4, 2012 text messages sent by a co-conspirator ("CC-5") to Cellphone-4 stated the following: "Here is d a/cs no. 0002720617 of Union Bank of nigeria Plc., Akure main branch, name: Pastor & Mrs I.A. Olugbogi. Have a nice day." and "I deposited $2500 for the N400,000."

b.      On or about April 16, 2014 a text message sent by CC-5 to

Cellphone-4 stated "I just sent 10,000."

c.      On or about April 16, 2014 a text message sent from

Cellphone-4 to CC-5 stated "'Yes, I received the instruction.

My acct officer transferred d naira already. Confirm with them

in Nigeria."

24.     Neither the Ariyos nor Landmass is licensed with the State of New Jersey

to operate a money transmitting business, where such unlicensed operation is punishable as

misdemeanor and a felony under New Jersey State Law.

25.     Neither the Ariyos nor Landmass complied with the money transmitting

business registration requirements set forth in 31 U.S.C. § 5330, and the regulations prescribed

thereunder, in violation of 18 U.S.C. § 1960.

26.     Moreover, from at least in or about 2014 up to and including at least in or

about 2016, the Ariyos operated an unlicensed money transmitting business whereby the Ariyos

knowingly conducted, controlled, managed, supervised, directed, and/or owned all and part of an

unlicensed money transmitting business affecting interstate and foreign commerce in the form of

a New Jersey enterprise (the "Enterprise") that the Ariyos used to purchased United States

dollars in exchange for Nigerian naira, which the Ariyos undertook at black market rates.   In

furtherance of that conspiracy, and to effect the illegal object thereof:

a.      On or about October 3, 2016, Monica Ariyo caused a third

party ("'Individual-1") to deposit $1,000 in cash into the TD

Bank Account, in exchange for the Ariyos transmitting or

facilitating the transmission of Nigerian naira to an African

bank account identified by Individual-1.

b.      On or about October 12, 2016, Abisoye Ariyo caused a third

party ("Individual-2") to deposit three checks totaling $10,000

into the TD Bank Account which Individual-2 deposited at a

bank branch in the Bronx, New York, in exchange for the

defendants transmitting or facilitating the transmission of

Nigerian naira to an African bank account identified by

Individual-2.

c.      On or about October 17, 2016, Abisoye Ariyo caused a third

party ("Individual-3") to send a wire transfer from a Canadian

bank account to the TD Bank Account, in exchange for the

Ariyos transmitting or facilitating the transmission of Nigerian

naira to an African bank account identified by Individual-3.

**D.  The Proceeds of Various Fraud Schemes Were Deposited into the TD Bank Account Used by the Ariyos to Operate an Unlicensed Money Transmitting Business**

**a.  The Business Email Compromise Schemes**

27.     In an increasingly common fraud scheme known as a Business Email

Compromise Scheme, a fraudster will create a fictitious email account whose email address

closely resembles that of an intended victim.   The fraudster will then use that email address as a

means of communication whereby the fraudster will impersonate the victim of the scheme, then

trick an entity or person into sending funds that should have been sent to the victim to an account

under the control of the fraudster.   This typically occurs without the victim's knowledge and

before the victim or the deceived sender of the funds at issue is able to detect the fraud.

14

28.     As detailed below, wire fraud proceeds of two separate Business Email Compromise Schemes were deposited into the TD Bank Account.   In the chronologically occurring first of the two, funds were first laundered through various bank accounts and were ultimately deposited into the TD Bank Account.

### i. On or About October 11, 2016 Approximately $35,000.00 Obtained Through Wire Fraud Pursuant to a Business Email Compromise Scheme was Deposited Into the TD Bank Account

29.     Pursuant to a Business Email Compromise Scheme (the "First Business Email Compromise Scheme") a fraudster or fraudsters ("Victim-1's Email Spoofer") created an email address similar to that of an email address associated with the accounts receivable department of a business entity ("Victim-1") that did business with a village in Wisconsin (the "Village").   On or about August 31, 2016, Victim-1's Email Spoofer used this created email address ("Spoofed Email Address-1") to request that the Village update Victim-1's bank account information.   On that same day, a village employee sent an ACH Information Request Form to the Spoofed Email Address seeking Victim-1's updated bank account information pursuant to the fraudulent request made by Victim-1's Email Spoofer.

30.     On or about September 2, 2016, the completed ACH form was returned to the Village through the Spoofed Email Address.   The ACH form was signed by a fraudster impersonating the "President" of Victim-1, listing the Spoofed Email Address, and listing bank account information for a SunTrust bank account ending in 3657 ( the "SunTrust One Account"). The Village updated Victim-1's file with this bank account information.

31.     On or about September 30, 2016, the Village requested that its bank make a $293,310.45 ACH payment, intended for and owed to Victim-1, to the SunTrust One Account.

On or about October 3, 2016, $293,310.45 intended for Victim-1 was transferred from the Village's bank to the SunTrust One Account.

32.     A co-conspirator ("CC-6") held the SunTrust One Account, as well as a second SunTrust account ending 2089 (the "SunTrust Two Account") and a third SunTrust account ending in 1915 ("SunTrust Three Account").

33.     On or about October 3, 2016, a payment in the amount of $287,000.00— a portion of the $293,310.45 payment made by the Village into SunTrust One Account—was transferred into the SunTrust Two Account and, on or about the same day, that $287,000.00 was transferred from SunTrust Two Account to the SunTrust Three Account.

34.     On or about October 4, 2016, approximately $100,000 was transferred from the SunTrust Three Account back into SunTrust One Account and, on or about October 6, 2016, approximately $20,000.00 was transferred from the SunTrust Three Account back into the SunTrust One Account.   On or about that same day, approximately $100,000 was withdrawn from the SunTrust Three Account.   Also on or about that same day, a cashier's check drawn by CC-6 at SunTrust Bank for approximately $100,000.00 was deposited into a Bank of America account.

35.     On or about October 7, 2016, approximately $90,000.00 was withdrawn from the SunTrust One Account.   On or about that same day, a cashier's check drawn by CC-6 at SunTrust Bank for approximately $90,000 was deposited into a Bank of America account.

36.     On or about October 11, 2016, an outgoing wire transfer for $35,000.00, which was traceable to the $293,310.45 payment made by the Village into SunTrust One Account intended for Victim-1, was sent from the SunTrust Three Account to the TD Bank Account which contained the Defendant in Rem Funds.

37.     On or about October 27, 2016, and again on or about October 31, 2016, Victim-1 reached out to the Village informing the Village that Victim-1 had never received the expected payment owed to Victim-1 in the amount of $293,310.45.   It was only then that the wire fraud scheme involving the theft of the $293,310.45 intended for Victim-1 was made known to the Village and Victim-1.

       **ii.   On or About October 12, 2016 Approximately $19,984.00 Obtained Through Wire Fraud Pursuant to a Business Email Compromise Scheme was Deposited Into the TD Bank Account.**

38.     Pursuant to a Business Email Compromise Scheme (the "Second Business Email Compromise Scheme") a fraudster or fraudsters ( "Victim-2's Email Spoofer") created an email address similar to an email address associated with that of the owner of a business entity ("Victim-2").   On or about September 28, 2016, Victim-2's Email Spoofer sent an email to a customer of Victim-2 ("Customer-1") requesting payment in the amount of $25,947.87 to satisfy an amount due on an invoice owed by Customer-1 to Victim-2.   This email included wire instructions for Wells Fargo account which Victim-2's Email Spoofer claimed was held in the name of Victim-2's business.   Apparently, Victim-2's Email Spoofer had obtained access to emails previously exchanged between Victim-2 and Customer-1 referencing the invoice number and the balance owed by Customer-1 to Victim-2.

39.     On or about October 7, 2016, Victim-2's Email Spoofer requested that Customer-1 reverse the payment made to the Wells Fargo account.   On or about October 11, 2016 Victim-2's Email Spoofer requested that Customer-1 resend the $25,947.87 to the TD Bank Account, providing wire instructions and information for the TD Bank Account.

40.     On or about October 12, 2016, Customer-1, in response to the fraudulent emails sent by Victim-2's Email Spoofer, wired a $20,011.00 payment to the TD Bank Account,

which was received as an incoming amount by the TD Bank Account in the amount of $19,984.00 (the "October 12, 2016 Wire Transfer").   That same day Customer-1 sent a copy of the wire transfer receipt to Victim-2's Email Spoofer's email address.

41.     On or about October 14, 2016 Customer-1 learned that Victim-2 had not received the October 12, 2016 Wire Transfer Payment.   On that same day, after Customer-1 contacted Victim-2 in regard to the missing October 12, 2016 Wire Transfer Payment, Customer-1 and Victim-2 realized that Customer-1 had been fraudulently induced by a fraudster impersonating Victim-2 to send the October 12, 2016 Wire Transfer Payment to an account that had no connection to Victim-2.

42.     Shortly thereafter, Customer-1 discovered that the emails received from Victim-2's Email Spoofer were no longer in Customer-1's email inbox.   Customer-1 contacted her email provider who informed Customer-1 that someone had accessed Customer-1's email account from Nigeria and the United States.

**b.  The Romance Schemes**

43.     In a common fraud scheme ("Romance Schemes") some fraudsters will use online dating websites to romantically win over a victim and, once in a relationship with such victim, will induce the victim to send the fraudster money or other assistance, usually in response to some crisis fabricated by the fraudster in a bid for the victim's sympathy.

44.     As detailed below, wire fraud proceeds of two separate Romance Schemes were deposited into the TD Bank Account.

*i.*  **On or About October 11, 2016 Approximately $42,000.00 Obtained Through Wire Fraud Pursuant to a Romance Scheme was Deposited Into the TD Bank Account.**

18

45.     Pursuant to a Romance Scheme (the "First Romance Scheme"), in 2016 a co-conspirator ("CC-7") met a woman ("Victim-4") online.   CC-7 and Victim-3 began a relationship that Victim-3 stated existed primarily online and included at least one in-person meeting in or about March 2016.   Victim-3 considered CC-7 to be her boyfriend.

46.      Victim-3 sent funds in various amounts to CC-7 on several occasions.

47.     On or about October 12, 2016, pursuant to CC-7's instructions, Victim-3 wired approximately $42,000.00 into the TD Bank Account, which CC-7 informed Victim-3 that he had received (the "October 12, 2016 Wire Transfer").

48.     Prior to that, in March of 2016, CC-7 claimed to Victim-3 that he had traveled to Doha, Qatar.   According to Victim-3, CC-7 had not returned since.

49.     Victim-3 stated to HSI investigators conducting the HSI Ariyos Investigation that CC-7 had defrauded her of the $42,000.00 October 12, 2016 Wire Transfer.

### ii.  On or About October 21, 2016 Approximately $3,190.00 Obtained Through Wire Fraud Pursuant to a Romance Scheme was Deposited Into the TD Bank Account.

50.     Pursuant to a Romance Scheme (the "Second Romance Scheme"), on or about late September 2016, a co-conspirator ("CC-8") extended a Facebook friend request to a man ("Victim-4").   CC-8 claimed to be a young American woman originally from the same town that Victim-4 then currently lived.   CC-8 told Victim-4 that she currently lived in Nigeria.

51.     Overtime, CC-8 directly, or through another individual, defrauded Victim-4 out of approximately $25,000.00 by falsely claiming, variously, that CC-8's mother had become disabled and hospitalized, that CC-8 required funds to live on which she asked Victim-4 to send her, that CC-8 had been in a car accident and that CC-8 would not receive medical treatment unless Victim-4 sent funds to pay for it.

19

52.     On or about October 21, 2016, pursuant to the Romance Scheme executed by CC-8, Victim-4 wired approximately $3,190.00 into the TD Bank Account.

**c. The Black Money Scheme**

53.     In a common fraud scheme (a "Black Money Scheme") fraudsters will contact potential victims claiming to be in possession of large amounts of United States or foreign currency that has been dyed black—supposedly so it can be smuggled, typically out of Africa—through a chemical process which can only be reversed through the use of an expensive chemical.   The fraudsters will then induce their victims to provide them with funds for the procurement of chemicals, with the promise that once the chemicals are applied to the currency and the black dye removed they will share the currency with their victims.   After obtaining funds from their victims, these fraudsters will either then disappear or provide what they claim is black dyed currency, which typically turns out to be ordinary black construction paper.

54.     As detailed below, wire fraud proceeds from a variation on a Black Money Scheme were deposited into the TD Bank Account.

> **i.  On or About August 24, 2016 Approximately $7,800.00 Obtained Through Wire Fraud Pursuant to a Black Money Scheme was Deposited Into the TD Bank Account.**

55.     Pursuant to a Black Money Scheme (the "Black Money Scheme"), from at least on or about August 2016 and up to on or about December 2016, an individual ("Victim-5") was in contact with one or more co-conspirators purportedly organized as a group (the "Co-Conspirator Group") who at various times claimed to be in possession of "black" or "product," i.e. black money as described in paragraph 52.

56.     On or about August 10, 2016, a member of the Co-Conspirator Group ("CC-9") directed Victim-5, in an email exchange, to wire approximately €7,000.00, pursuant to

a contracted fee, to a bank account in London in exchange for CC-9 and the Co-Conspirator

Group to provide "privileges" that would be made available to Victim-5 once the "product passes

examination and process in Switzerland," i.e. for the cleaning of black money in a Black Money

Scheme.

57.     On or about August 16, 2016, CC-9, in an email, indicated it would be

easier for Victim-5 to send the wire to a bank account located in the United States because

Victim-5 could make the wire in United States currency.

58.     On or about August 24, 2016, CC-9 emailed Victim-5 with bank account

information for the TD Bank Account stating that the €7,000.00 contract fee was equivalent to

$7,800 in United States currency.   CC-9 provided Victim-5 with the TD Bank Account's bank

account number, the account holder's name (Landmass), and an address in Freehold, New

Jersey, which is where the TD Bank Account was opened.

59.     On or about August 24, 2016, Victim-5 wired $7,800.00 to the TD Bank

Account.

60.     Victim-6 and the Co-Conspirator Group continued their negotiations up

until and including December 2016.

61.     To date, Victim-6 has not received anything promised to him by CC-9 or

the Co-Conspirator Group.

62.     On or about December 16, 2016 the Honorable James C. Francis IV sitting

in the United States District Court, Southern District of New York, signed a seizure warrant

authorizing federal law enforcement agents to seize the TD Bank Account, which, at seizure,

contained $457,874.55 in United States Currency (i.e., the Defendant in Rem Funds) as being

subject to civil forfeiture to the United States of America.

## IV.   CLAIMS FOR FORFEITURE

### First Claim for Relief
### Forfeiture Under 18 U.S.C. § 981(a)(1)(A):
### Property Involved in Concealment Money Laundering in Violation of
### 18 U.S.C. § 1956(a)(1)(B)(i)

63.   Paragraphs 1 through 61 of this Civil Forfeiture Complaint are repeated and re-alleged as if fully set forth herein.

64.   18 U.S.C. § 981(a)(1)(A) subjects to forfeiture "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of section 1956 . . . of this title, or any property traceable to such property."

65.   18 U.S.C. § 1956(a) imposes a criminal penalty on:

**(a)(1)** Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity—

**(B)** knowing that the transaction is designed in whole or in part—

**(i)**   to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity.

66.   18 U.S.C. § 1956(c)(7)(A) provides that the term "specified unlawful activity" includes "any act or activity constituting an offense listed in section 1961(1) of this title."

67.   Included among the enumerated offenses in 18 U.S.C. § 1961(1) is 18 U.S.C. § 1343 which provides that "[w]hoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent

pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice" shall be subject to criminal penalty.

68.     As set forth herein, wire fraud proceeds were obtained in violation of 18 U.S.C. § 1343 pursuant to 1) the First Business Email Compromise Scheme described above and deposited into the TD Bank Account on or about October 11, 2016; 2) the Second Business Email Compromise Scheme described above and deposited into the TD Bank Account on or about October 12, 2016; 3) the first Romance Scheme describe above and deposited into the TD Bank Account on or about October 11, 2016; 4) the Second Romance Scheme described above and deposited into the TD Bank Account on or about October 21, 2016; and 5) the Black Money Scheme described above and deposited into the TD Bank Account on or about August 24, 2016. These deposits were made by co-conspirators in order to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of the wire fraud schemes (i.e. specified unlawful activity) described above.

69.     The Defendant in Rem Funds are therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) as property involved in a money laundering offense, in violation of 18 U.S.C. § 1956(a)(1)(B)(i), i.e. concealment money laundering.

### Second Claim for Relief
### Forfeiture Under 18 U.S.C. § 981(a)(1)(A):
### Property Involved in Operation of an Unlicensed Money Transmitting Business, in Violation of 18 U.S.C. § 1960

70.     Paragraphs 1 through 61 of this Civil Forfeiture Complaint are repeated and re-alleged as if fully set forth herein.

71.     18 U.S.C. § 981(a)(1)(A) subjects to forfeiture "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of section . . . 1960 of this title, or any property traceable to such property."

72.     18 U.S.C. § 1960 imposes a criminal penalty on: "[w]hoever knowingly conducts, controls, manages, supervises, directs, or owns all or part of an unlicensed money transmitting business."

73.     As set forth herein, the Ariyos directed co-conspirators to deposit, wire, or otherwise transfer funds into the TD Bank Account in exchange for the Ariyos to transmit and facilitate the transmission of Nigerian naira to African bank accounts.   The Ariyos also accepted the deposit of such funds into the TD Bank Account for the same purpose.   As also set forth above, neither the Ariyos, nor Landmass, were licensed to operate a money transmitting business with the State of New Jersey, where such unlicensed operation is punishable as a misdemeanor or felony under New Jersey State Law, nor did the Ariyos or Landmass comply with the money transmitting business registration requirements set forth in 31 U.S.C. § 5330, and the regulations prescribed thereunder, in violation of 18 U.S.C. § 1960.

74.     The Defendant in Rem Funds are therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) as property involved in the operation of an unlicensed money transmitting buiness, in violation of 18 U.S.C. § 1960.

### Third Claim for Relief
### Forfeiture Under 18 U.S.C. § 981(a)(1)(C):
### Proceeds Traceable to Wire Fraud in Violation of
### 18 U.S.C. § 1343

75.     Paragraphs 1 through 61, and 65 through 67 of this Civil Forfeiture Complaint are repeated and re-alleged as if fully set forth herein.

76.     18 U.S.C. § 981(a)(1)(C) subjects to forfeiture:

> [a]ny property, real or personal, which constitutes or
> is derived from proceeds traceable to a violation of .
> . . any offense constituting "specified unlawful
> activity" (as defined in section 1956(c)(7) of this
> title) or a conspiracy to commit such offense.

77.     The Defendant in Rem Funds are therefore subject to forfeiture pursuant

to 18 U.S.C. § 981(a)(1)(C) as proceeds traceable to wire fraud in violation of 18 U.S.C. § 1343.

WHEREFORE, plaintiff United States of America prays that process issue to

enforce the forfeiture of the Defendant in Rem Funds and that all persons having an interest in

the Defendant in Rem Funds be cited to appear and show cause why the forfeiture should not be

decreed, and that this Court decree forfeiture of the Defendant in Rem Funds to the United

States of America for disposition according to law, and that this Court grant plaintiff such further

relief as this Court may deem just and proper, together with the costs and disbursements of this

action.

Dated: New York, New York
     March  10 , 2020

                     GEOFFREY S. BERMAN
                     United States Attorney for the
                     Southern District of New York
                     Attorney for the Plaintiff
                     United States of America

          By:         _____
                     JACOB H. GUTWILLIG
                     Assistant United States Attorney
                     One St. Andrew's Plaza
                     New York, New York 10007
                     Telephone: (212) 637-2215

## **VERIFICATION**

STATE OF NEW YORK           )
COUNTY OF NEW YORK          :
SOUTHERN DISTRICT OF NEW YORK  )

    MARK NOVATSKI, being duly sworn, deposes and says that he is a Special

Agent with Homeland Security Investigations ("HSI"), and as such has responsibility for the

within action; that he has read the foregoing complaint and knows the contents thereof, and that

the same is true to the best of his knowledge, information, and belief.

    The sources of deponent's information and the ground of his belief are official

records and files of the HSI, information obtained directly by the deponent, and information

obtained by other law enforcement officials, during an investigation of alleged violations of Title

18 of the United States Code.

               MARK NOVATSKI
               Special Agent
               Homeland Security Investigations

Sworn to before me this
10ᵗʰ day of MARCH 2020

NOTARY PUBLIC

**LYNNETTE DURKO**
**NOTARY PUBLIC OF NEW JERSEY**
My Commission Expires 7/14/2021